The United States v. Bonds is the next case for argument. Ms. Armour. Good morning, Your Honors. May it please the Court. My name is Molly Armour and we are here regarding the trial of Myshawn Bonds on two counts of bank robbery. There were two different robberies that occurred in this case. One was the August 25th robbery of a BMO, Harris Bank in Carpentersville, and one is the September 11, 2015 robbery of a Chase Bank in Joliet. The lone issue that we have raised on appeal is whether the District Court violated Mr. Bonds' Sixth Amendment rights to confrontation, where the Court barred any cross-examination regarding the Mayfield matter, where there were significant parallels to this matter. What specifically did you want to do with, or did the Defense Counsel want to do with Mayfield at a level of particularity? I'm sorry, Your Honor. With some specificity, what did they want to do with Mayfield? So in this case, we had the latent fingerprint examiner was from the same FBI unit, the latent print unit, that was part of the Mayfield decision. Right. So there were specific protocols that applied in Mayfield that failed to account for what transpired in this case. Ten years earlier. Ten years earlier. But as we know from the recent PCAST report, Mayfield remains a significant touchstone in the field of latent print examination because that error was so substantial and so systemic that it was necessary to continue to evaluate that error. So even in a report post-dating the Rivas opinion in this case, the Presidential's Council on Science and Technology Advisors issued a report going through Mayfield and talking about that. And the FBI laboratory at issue in this case had made some changes and result to Mayfield. Because it's the same unit at issue here as it was in Mayfield, it was perfectly appropriate for examination to be had and I think actually necessary to help the jury truly understand. Was there a desire to reference Mayfield expressly by name, the Mayfield case? It would not have been necessary had the court allowed us to, you know, get into the boundaries of that. I think as was seen through the crafting of the cross-examination issues in this case, the district court clearly used a strong hand in talking about what kinds of questions were going to be acceptable in other areas and some that weren't. So I would have expected the district court in this case perhaps to say, you know, we'll talk to the examiner ahead of time. We don't even need to reference this by name. But it's a core example of the failures of this particular laboratory as it relates to, and again in this case, the issues of confirmation bias. Was there any other evidence identifying Bonds? There was. Like eyewitnesses? There was actually few eyewitnesses that actually identified Mr. Bonds. There was only one photo array that actually existed in this case and that was one bank teller. One of the bank tellers, who was the only bank teller who testified regarding the BMO Harris robbery, she saw the secondary robber, which the government reported was Mr. Bonds, as someone who was six feet tall. Yet the evidence in this case showed that Mr. Bonds was significantly shorter than that. And then in the second robbery, there were two bank tellers. Only one made an identification in that case. And that person had only served the bank robbers for a period of five seconds before making that identification. The government and I have different opinions on the suggestiveness of the identifications in this case. But the remaining identifications, those of our children's homestead witnesses and of Mr. Bonds' own grandparents, proceeded in a manner that were completely suggestive. In Mr. Bonds' grandparents' case, the FBI and the local law enforcement showed up at their door, told that Mr. Bonds had been involved in some kind of robbery, had been arrested, and then showed them a still photo. It's very clear what the answer to that identification would have been. The clear answer that people were supposed to give is that that was, in fact, Mr. Bonds. And we certainly don't dispute that the bank robber in those photographs looked very similar to Mr. Bonds. But even at trial, his own grandmother said that she was not sure about one of those photographs. So there was that identification. But significantly, something that the government has never addressed in this brief or below in the district court was significant video evidence of one of the robberies, both of the robberies, showing the person that they purported to say, Mr. Bonds, extending an arm and receiving money repeatedly on video where there was no tattoo of Mr. Bonds. A significant, almost full-arm tattoo that was shown before the jury and identified by his grandmother as predating the robbery. So we've actually physical evidence in this case that someone other than Mr. Bonds was likely the culprit. So although there were these varied witness identifications, our perspective is— It was his grandmother that testified to that? And again, after these suggestive processes, which I'm sure none of us would want if a loved one of ours was subjected to a criminal investigation, to have law enforcement seek to get an identification in that kind of manner. After that testimony, we still have this video evidence, which the government has never been able to discuss because there is no answer for that evidence. Other than that was not Mr. Bonds. So this is a circumstance where the error of the district court in refusing to allow cross-examination in the case where we have, for one of the bank robberies, only six and then eight points of identification on a fingerprint, which is significant. Were you able to ask Mr. Glass about errors that occur? We were able to ask Ms. Glass about the error rate, although the judge did not allow us to get into the 1 in 18 error rate. We did ask about the 1 in 306 error rate. It is my perspective that I think that that means little to leisurers. I think that is more of our scientific jargon that doesn't hit home in a way that a real-life example of how systemic failures of this particular institution came to bear on a real person's life. We're talking about leisurers. This seems like you're going back on what you may have said earlier because I think it risks severe prejudice to say there was a guy named Brandon Mayfield in Oregon who was arrested for a terrorist bombing in Spain. I think the jury could say, what are they talking about? I think what the word terrorism does, and this particular case, is it shows the amount of level of concern that this particular laboratory would have had to take to make sure to get it right. Now, if the district court would have barred us from talking about terrorism, we still would have wanted to get into how someone with even more points of comparison than Mr. Bonds from this same laboratory was able to go through all of these different steps and yet still come out with a false positive. And the PCAST report talks about this in terms of, and this is post-dating this court's jurisprudence in Rivas, which says it is clear that the general public at large, and jurors in particular, feel that this fingerprint evidence is beyond reproach. That is something that we've cited in our brief, we've quoted in our brief. The concern is that jurors think that this is infallible information. So I will reserve the remaining of my time for rebuttal, but I do think that it's appropriate to consider that this particular evidence, actually not being allowed to get into it, left an unfair impression for the jury, and it was actually unhelpful for the jury in determining this information, because there was an absence of real-world application to how this affects the determinations. Thank you, Ms. Arner. Ms. Coleman. May it please the court. My name is Kalia Coleman, and I represent the United States of America. The district court committed no error in limiting defendants' cross-examination of the fingerprint expert in this case. Consistent with this court's ruling in United States v. Rivas, the district court properly precluded defense counsel from cross-examining the witness about the Mayfield case. The court determined, as Judge Scudder pointed out, that this would have resulted in prejudice, and that it would have, in essence, resulted in a mini-trial of issues that were unrelated to this case. Despite that limitation, defendant was permitted to extensively cross-examine the expert witness, and did, in fact, extensively cross-examine the expert witness about the unreliability or potential unreliability of the ACV methodology. Some specific examples of that. Defense counsel was able to go into detail about the manner in which the fingerprint expert employed the ACV methodology. Defense counsel was able to ask the expert about the 2011 URI study, which showed that there was no zero error rate in fingerprint analysis. Defense counsel was also allowed opportunity to cross-examine, and much of the cross-examination focused on these theories of confirmation and contextual bias. Defense counsel asked the witness on several occasions about the fact that the examiner had knowledge that Bonds was the suspect in the robberies, and whether there were studies, and whether there was a possibility that that information affected the examiner's analysis in this case. Defense counsel was also able to explore the verification process, and was able to point out on cross-examination that here, the fingerprint examination was subject to non-blind verification versus blind verification, which this court knows means that the second examiner who verified the results of the initial findings made by Ms. Glass knew Ms. Glass's findings. Based on the totality of all the different areas that defense counsel was allowed to explore on cross-examination, there certainly was no confrontation issue here, because counsel was given the opportunity to provide meaningful cross-examination, and to put before the jury the potential unreliability of fingerprint examination. Based on this, the short limitation that the court imposed in not allowing this trial to get sidetracked to a determination or a decision, or comparison, I should say, with the Mayfield case was proper. Before I conclude, as to Ms. Armour's argument that the government failed to address the issue of the defendant's tattoos, forearm tattoos not being visible in the videos, that information was made known to the jury through the defense. And as the arbiter of facts and credibility, the jury was able to view those videos and determine whether or not that affected the credibility of the government's evidence. And so for these reasons, unless the court has further questions, the government… I have one quick question for you, Ms. Coleman. The latitude on Mayfield was not entirely foreclosed because those Ulrey studies that you're talking about, didn't they arise out of the Mayfield incident? I mean, that's why the Bureau or the Department of Justice undertook those very studies. And those studies were allowed to be used in the cross-examination of Ms. Glass, correct? Precisely, Your Honor, yes. So it's not as if the quality control issues in the review of Mayfield was procedurally and with respect to the substance of this particular method was altogether excluded. All I could tell that was excluded was a reference to Brandon Mayfield as an individual and the terrorist attack in Spain and him living in Oregon and, you know, the whole mess of facts that was in that case. Yes, Your Honor, and when you speak of protocols and quality control methods, the verification process that was implemented and was discussed in great detail during the cross-examination of the witness was something that was instituted by the FBI post-Mayfield as a way to address this issue that occurred of a false positive identification in Mayfield. So there are no further questions. The government would ask that this court rule consistent with Rivas and that the defendant and affirm the defendant's conviction and sentence in this case. Thank you.  Briefly, Your Honor. So to address what Your Honor has raised regarding these other studies, to be clear, I think the import of Mayfield in this cross-examination was the illustration of a real-life example of how this works. Our jurors are laypeople. They are not scientists, although we could have one. They are human beings who are trying to weigh information, and they come from all walks of life. And as I referenced earlier in the PCAST report, one of the key points was the empirical estimated false positive rates are much higher than the general public and, by extension, most jurors would likely believe based on longstanding claims about the accuracy of fingerprint analysis. And I think what's significant here is talking about error rates, talking about the fact that there is no such thing as zero certainty, that means something to us as practitioners in this and the people who deal with that. But the people who really have to make a decision, it's recognized that they don't really understand what that means. Take away the terrorism, take away Madrid, strip away all of that stuff about Mayfield. The example of one human being from this particular laboratory being subjected to the same kind of— Yes, thank you, counsel. Thank you, Your Honor. We would ask for remand and retrial. Ms. Armour, the court appreciates your willingness to accept the appointment in this case and your assistance to the court as well as your client.